```
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
 4               Plaintiff,               1:18-cr-00078-PLF-1
                                          Tuesday, December 4, 2018
 5     vs.                                10:37 a.m.

 6     ARNOLD S. BOON,

 7               Defendant.
       - - - - - - - - - - - - - - - x
 8

 9     _____

10                   TRANSCRIPT OF STATUS CONFERENCE
             HELD BEFORE THE HONORABLE PAUL L. FRIEDMAN
11                   UNITED STATES DISTRICT JUDGE
       _____
12     APPEARANCES:

13     For the United States:    STEVEN B. WASSERMAN, ESQ.
                                 U.S. ATTORNEY'S OFFICE FOR THE
                                 DISTRICT OF COLUMBIA
14                               555 Fourth Street, NW
                                 Washington, DC 20530
15                               (202) 252-7719
                                 steve.wasserman@usdoj.gov
16

17     For the Defendant:        ANDREA ANTONELLI, ESQ.
                                 UNITED STATES ATTORNEY'S OFFICE
18                               FOR THE DISTRICT OF COL
                                 555 4th Street NW
19                               Washington, DC 20530
                                 (202) 255-7723
20                               andrea.antonelli@usdoj.gov

21
       Court Reporter:            Lisa A. Moreira, RDR, CRR
22                                Official Court Reporter
                                  U.S. Courthouse, Room 6718
23                                333 Constitution Avenue, NW
                                  Washington, DC  20001
24                                (202) 354-3187

25
```

```
1                    P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  Your Honor, this is
3    Criminal Case 18-078, United States of America vs. Arnold S.
4    Boon.
5            I'm going to ask counsel to please approach the
6    podium and state your appearance for the record.
7            MR. WASSERMAN:  Good morning, Your Honor; Steven
8    Wasserman on behalf of the United States.
9            MS. ANTONELLI:  Good morning, Your Honor; Andrea
10   Antonelli on behalf of Mr. Boon.
11           THE COURT:  Good morning.
12           Good morning, Mr. Boon.
13           THE DEFENDANT:  Good morning, Your Honor.
14           THE COURT:  All right.  We're here for a status
15   conference which was supposed to be tomorrow.  We moved it
16   today because of President Bush's funeral.
17           I received a letter from Mr. Boon, which I emailed
18   to counsel on both sides, and subsequently I've got a motion
19   filed by Ms. Antonelli, a motion to withdraw as counsel.
20           Mr. Boon has had three different lawyers.  This
21   has to end at some point.
22           You don't get to choose your lawyer.  You don't
23   get to fire every lawyer you don't like.  You're appointed
24   competent counsel under the Criminal Justice Act, and this
25   is your third lawyer.  At some point this case has to move
```

1    forward one way or the other, on motions, on a trial, on a

2    plea.

3              You can represent yourself, if you want to.  You

4    have a constitutional right to represent yourself, but you

5    can't fire every single lawyer that's appointed for you.

6    Obviously, if there's a good reason.  But I don't think I've

7    ever had a situation -- I think I've had one situation.

8              But we've gone through three different lawyers who

9    are all, you know -- I mean, I can't remember the history of

10   the case, but we started with Mr. Vanegas, then his

11   colleague from -- also from the Federal Public Defender,

12   Ms. Peterson, and now Ms. Antonelli, who is not connected

13   with the Federal Public Defender but is on our Criminal

14   Justice Act list for appointment and is well-regarded by

15   everybody I know.

16             So maybe somebody can explain to me -- maybe

17   Ms. Antonelli, maybe Mr. Boon -- what the problems are.

18             MS. ANTONELLI:  Well, Your Honor, I think one of

19   the issues and why Mr. Boon is so frustrated is that when I

20   got this case in August there was a plea offer that was

21   pending, and he had actually signed the paperwork with

22   Ms. Peterson.  He was unhappy with Ms. Peterson, and I got

23   the case and started reviewing the case, and he asked me to

24   negotiate a better plea offer.

25             And shortly thereafter, when I was reviewing the

1    plea offer, I realized that in my view the criminal history

2    was calculated incorrectly, and unfortunately calculated

3    incorrectly not in favor of Mr. Boon.  It was worse than

4    what was listed on the paperwork.

5              THE COURT:  Is this before or after probation had

6    done a criminal calculation?

7              MS. ANTONELLI:  I believe before.  I don't have --

8    I believe this is before we received that.

9              I called Mr. Wasserman and said, "I don't think

10   this is right.  I'm concerned about how you came to this

11   calculation."

12             So then we got the criminal history calculation.

13             Shortly thereafter, the government started looking

14   into whether potentially Mr. Boon was a career offender, and

15   we were going back and forth about that.

16             So I had to let Mr. Boon know at that point that

17   there was no plea offer pending for him because the first

18   plea offer was essentially void because the criminal history

19   calculation was incorrect.

20             So I do understand his frustration with that, and

21   he was very concerned and, I think, believes there's some

22   kind of conspiracy between the parties to have him sign the

23   first plea agreement and then get a higher sentence.  So

24   that was one issue.

25             Subsequently, I think after Mr. Boon wrote the

1    letter to the Court, Mr. Wasserman and I continued

2    discussing this, and the government's view changed.  And the

3    government said, "No, we now believe he is not a career

4    offender."

5          So essentially his initial plea offer is now

6    available to him with the corrected criminal history

7    category.  However, by the time I saw Mr. Boon where he's

8    housed and came with that news, he was already very upset, I

9    think, about other issues, not just the plea issue, and had

10   already --

11         THE COURT:  Wait a second.  He expressed some

12   concern in this letter, and maybe a prior letter as well,

13   about the fact that this case was originally -- something

14   that was originally brought in Superior Court, and then it's

15   brought over here, and his feeling maybe you had

16   conversations with him or maybe prior counsel had

17   conversations with him about why that sometimes happens and

18   why, in some cases, it may not seem fair.

19         But we have -- in this district we have a United

20   States Attorney who's both a federal prosecutor and a local

21   prosecutor, and he has a choice of which court to bring

22   certain kinds of cases in, assuming there's jurisdiction and

23   assuming there's a legitimate criminal offense under the

24   law, either D.C. Code or U.S. Code.  So I get that was a

25   part of his -- at least earlier on, maybe still --

1    frustration.

2         MR. ANTONELLI:  I think that that's a frustration.

3    He's also frustrated that he's housed very far away, and I

4    have had multiple videoconferences with him but have only

5    actually sat down with him at that prison one time.

6         THE COURT:  Is there a reason for that or a reason

7    why we couldn't change that?

8         MS. ANTONELLI:  I think that was brought up at

9    prior hearings, and this is the issue, that the Marshals had

10   moved most federal prisoners out of the D.C. Jail.

11        THE COURT:  But that's all -- that's changed

12   now.  I thought that was resolved; that now -- I think it

13   was resolved going forward, but maybe not resolved with

14   people -- in other words, there were legitimate concerns

15   that the Marshals had with the way the Department of

16   Corrections was keeping track of prisoners, which led to a

17   number of very practical problems.  I think there is now a

18   memorandum of understanding or an agreement that prisoners

19   from this court can now be held in the D.C. Jail.

20        I don't know how it's affected those that were

21   outside the jurisdiction, but I don't know whether it would

22   help if you could talk to the general -- I don't know who

23   makes the decision.  There's a general counsel of the

24   corrections department, Ms. Amato, who is often helpful, as

25   you know.  There's also a deputy marshal who -- one or two

1    deputy marshals that deal with the Bureau of Prisons and

2    where prisoners are located.

3             MS. ANTONELLI:  I think Marshal Krieger, I think

4    is his name.

5             DEPUTY MARSHAL:  Criego.

6             MS. ANTONELLI:  Criego, Criego.

7             THE COURT:  Marshal Criego, thank you.  So I don't

8    know if something could be worked out to get Mr. Boon closer

9    to home.  That might be worth trying to make the effort.

10            MS. ANTONELLI:  So, Your Honor, I think in

11   addition to those issues, some other things that he outlined

12   in the letter and which were expressed to me were the

13   feeling that the defense is responding to the government's

14   evidence instead of moving forward to prepare a defense.

15   And I think I could probably ex parte explain to the Court

16   what some of that is about, but that, I believe, is another

17   one of his concerns about whether there's an affirmative

18   defense that we could put on at trial.

19            THE COURT:  Let me say just in general, without

20   knowing it specifically, that obviously -- and I'm saying

21   this for your benefit, Mr. Boon -- Ms. Peterson's lost

22   something -- the decision whether or not to plead guilty or

23   go to trial is your decision.  The lawyer, whoever your

24   lawyer is, can't make that decision for you.  That's your

25   decision.  And the only thing that the lawyer can do is give

1    you her best advice on the strength of the government's

2    evidence and the likelihood of conviction versus acquittal

3    and the potential sentence, if you're convicted, versus the

4    potential sentence if you're -- if you plead guilty.

5              And, you know, if you want to go to trial, there's

6    an obligation on a defense lawyer to investigate and to try

7    to develop evidence to put on an affirmative defense, if

8    there is an affirmative defense.  And there's -- defense

9    lawyers also have certain ethical obligations.  All lawyers

10   have certain ethical obligations, and one is to represent

11   the client zealously and to be loyal to the client, but at

12   the same time the lawyer can't do anything unethical, can't

13   put witnesses on the stand that she knows are lying, can't

14   fabricate evidence, things like that.

15             But you have to decide whether you want to go to

16   trial or accept a plea, and then she can try to negotiate

17   the best plea she can.  And if you don't like the plea, you

18   can go to trial.

19             But at some point the case has to end.  If you're

20   convicted, either after a trial or on a plea, you'll get

21   credit for the time you've been locked up.  If you're

22   acquitted, obviously you're free to go after a trial.  But I

23   don't know what else to say.

24             Do you have anything else you want to say at the

25   moment?

1          MS. ANTONELLI:  Your Honor, I understand the

2     Court's frustration with Mr. Boon having multiple attorneys.

3     I would say that perhaps at this point Mr. Boon is so

4     suspicious of my motives and ability to represent him that

5     perhaps it would be better to give him another lawyer.

6          I'm just -- I'm not saying I'm not prepared to go

7     forward, but I'm just saying that based on my discussions

8     with him and his frustration, I'm not sure we can come to a

9     decision if he can't trust that I'm giving him appropriate

10    advice about the plea.

11         THE COURT:  Well, Mr. Boon, if you want to say

12    something to me right now -- I've read your letter, but if

13    you want to say something, I'd be happy to hear from you.

14    But I do want to just advise you -- I'm sure Ms. Antonelli

15    has, too -- anything you say might be incriminating about

16    the underlying facts of the case.  If you say it in open

17    court, it could be used against you later.

18         So I'm happy to hear what you have to say about

19    lawyers and about your frustration, just I'm advising you to

20    be careful what you say.  But come on up.

21         Good morning.

22         THE DEFENDANT:  Your Honor, I've been incarcerated

23    since March.

24         THE COURT:  Since March.

25         THE DEFENDANT:  Since March, March 17th.  And I

1    got indicted on these charges after the gun charge.  I got

2    indicted on the rest of the charges in April, end of April.

3         Since then I have -- like you said, I've had three

4    lawyers.  I have no pretrial investigation.  There's no --

5    you know started.  There's a bunch of issues that I come up

6    with, and I told Ms. Antonelli, one of them being me

7    thinking that I really -- I'm incarcerated and I'm indicted

8    on charges that the conduct of the offense doesn't even --

9    it doesn't match up.  I started from burglary and theft and

10   now I'm charged with bank robbery and Hobbs Act robbery.

11        I said something to Ms. Antonelli about that, and

12   instead of her investigating that situation, she came back

13   to me and said, "Well, they're not charging you as a career

14   offender now.  They've got a plea bargain for you."

15        But my issue is -- you know, she came down, and we

16   had a conversation, and she told me that her and the private

17   investigator had a conversation on the way to come see me,

18   and that I possibly could be charged under the wrong

19   statutes and that she will file a motion.  And then she

20   leaves and the next conversation that we had was:  I have

21   great news for you, now you have a plea bargain for the same

22   charges that I might be wrongfully charged on.

23        Now, I don't understand how I'm supposed to trust,

24   you know, an attorney who doesn't seem like they're, you

25   know, for my best interest.

1    If I'm coming to you saying that I have an issue

2    about what I'm locked up for, whatever the case may be, and

3    then you're still telling me well I can take a plea bargain

4    to these same counts instead of doing your research and

5    investigating, it really doesn't make sense to me.

6    But other than that, you know, I've been down

7    Northern Neck and the same -- like my attorneys don't want

8    to come down there.

9    THE COURT:  Yes.

10    THE DEFENDANT:  I understand it's a long drive.

11    They have other clients and everything.

12    I've actually even broken my hand on Thursday.  I

13    can't even get medical attention.  I've had an x-ray, and I

14    have been getting Motrins, ibuprofens; that's it.  And I

15    have a wrap on my hand.

16    But it's been very inconvenient, me being down

17    there, Your Honor.  I can barely get in contact with my

18    lawyers.  Whichever ones I've had, I've been barely able to

19    get in contact with them.

20    I've talked to Ms. Antonelli on the video visit.

21    You know, at times they're breaking up.

22    THE COURT:  Yes, it's complicated.

23    THE DEFENDANT:  It's very complicated, and it is a

24    strain on me.  At one point in time I'm not offered a plea

25    bargain because I'm a career offender, and I'm asking

1   Ms. Antonelli, "How am I a career offender?  I'm not

2   understanding."  And then right before court, "Oh, no, now

3   you're not a career offender so now they have a plea bargain

4   for you."

5           You know, it's really not making sense after

6   you're telling me that I should possibly plead guilty to the

7   whole indictment.  It doesn't -- it really doesn't make

8   sense to me.

9           THE COURT:  Well, the problem is that the

10  government -- I mean, the prosecutor and the grand jury have

11  the authority to decide what to charge somebody with.  Now,

12  there has to be probable cause.  There has to be evidence.

13  If there's some basis to move to dismiss some of these

14  counts -- there are, you know, three counts of -- there are

15  three counts of destruction of property under the D.C. Code,

16  and there's one count of carrying a weapon, carrying a

17  firearm, by a person previously charged -- previously

18  convicted of a felony.

19          And then you've got these three counts that are

20  the ones that are giving you concern, I guess.  One is a

21  conspiracy to interfere with interstate commence by robbery

22  and from an automatic teller machine in the custody and

23  control of a 7-Eleven store, and I don't know who the co-

24  conspirator is.  They're not identified.  And then

25  interference with interstate commerce by obtaining currency

1    from the 7-Eleven store and an employee of the 7-Eleven

2    store in the District of Columbia.  But they charged this

3    because the business is engaged in and affects interstate

4    commerce.  And then comes this bank robbery charge, which

5    you were talking about.

6            And all of these events -- I'll put it this way.

7    The gun charge is March 2018, and everything else is January

8    19, 2018, including the bank robbery.  And this does not say

9    anything about the 7-Eleven, even though all of the other

10   counts do.  This says that you took $130,000 from the care,

11   custody, and control and management of the U.S. Bank

12   National Association, a bank whose deposits are insured by

13   the Federal Deposit Insurance Corporation; and that because

14   they're insured by the Federal Deposit Insurance

15   Association, it's a bank covered by the federal bank robbery

16   statute.

17           So you know -- and I'm not asking -- but you have

18   discussed with your lawyers what happened on January 19,

19   2018, who you were with.  Were you at the 7-Eleven?  I'm not

20   asking you to answer that.  Were you at a bank?  Were you at

21   something called the National -- U.S. Bank National

22   Association, and what happened?

23           The destruction of property counts relate to an

24   ATM and the 7-Eleven and a truck.

25           And then, of course, there's the March 2018 -- two

1    months later -- possession of a weapon.  And I'm not sure

2    whether that's the day you were arrested with a gun, but I

3    assume that's what it is; that you were arrested and you had

4    a gun in your possession.

5           So you know what the facts are, and you know what

6    happened, and you know what didn't happen, and you know who

7    you were with, and you -- if the conditions were better and

8    were easier to communicate, you could explain it better to

9    your lawyers and could suggest possible defenses.

10          So what do you want to do?

11          THE DEFENDANT:  Your Honor, I just want somebody

12   that's going to fight for me.

13          THE COURT:  Someone to fight for you.

14          THE DEFENDANT:  That's it.  I mean, I was told

15   that I think about my case all day, and that's the problem,

16   but when I really don't have anybody else coming to me

17   saying, "Well, this is, you know, the direction that we can

18   go into," I feel like that's the only thing that I can do,

19   is figure it out on my own.  And I can bring it to her

20   attention, and hopefully, you know, she will file the proper

21   motions.

22          And I really don't know what else to do, though,

23   Your Honor.

24          THE COURT:  Well, do you want me to try to appoint

25   a different lawyer at this point?

```
 1                 THE DEFENDANT:  Yes, Your Honor.

 2                 THE COURT:  Okay.  Anything else you want to say?

 3                 THE DEFENDANT:  That's it.

 4                 THE COURT:  Mr. Wasserman, let me hear what the

 5      government wants to say.

 6                 MR. WASSERMAN:  Your Honor, just for the record

 7      and the defendant's information, the bank robbery charge

 8      stems from the fact that the funds in the ATM machine at the

 9      7-Eleven were owned by U.S. National Bank, which is an

10      FDIC-insured institution, so --

11                 THE COURT:  So any time there's an ATM that's

12      owned by a particular bank it's a bank robbery charge?

13                 MR. WASSERMAN:  If the funds are owned by an

14      institution that is FDIC-insured, yes, it's a bank robbery.

15                 THE COURT:  So if I go to -- if there's a -- I

16      don't know, pick a bank -- Bank of America ATM out in front

17      of a CVS, and I take funds from there, then it's a bank

18      robbery charge, not just --

19                 MR. WASSERMAN:  Not just a destruction of an ATM

20      or a theft of funds.

21                 That being said, I anticipate -- let's say the

22      defendant went to trial and was convicted on all three of

23      those counts -- the conspiracy to commit Hobbs Act, the

24      Hobbs Act, and the bank robbery -- I believe they would

25      merge, so I don't believe there would be a scenario where he
```

1   would be exposed, say, to consecutive sentences if the Court

2   so chose.  But that's just for the Court's information and

3   the defendant's information.

4          There are alternative theories on which we charged

5   him with offenses all arising from the theft -- or the

6   robbery of the ATM in the 7-Eleven.

7          To sort of just go back to the history of the case

8   from the last time that we were here, we got the pretrial

9   criminal history report.  That indicated the defendant's

10  criminal history category was different than what myself and

11  Ms. Peterson had estimated.

12         After taking a look at his criminal history, I had

13  to order his -- some information from PG County as it

14  related to convictions that I thought could possibly expose

15  him to career offender status.  That took a couple of weeks

16  to get.

17         I informed Ms. Antonelli that, you know, I was

18  concerned that he might be a career offender.  You know, I

19  took the original plea off the table because of the change

20  in his criminal history category, and then, obviously, the

21  career offender -- the potential for the career offender

22  guideline, after consulting with Ms. Antonelli, we

23  determined that he was not, in fact, a career offender, and

24  I reextended the original plea, which was to Counts 1 and 3

25  of the indictment.

1           THE COURT:  What counts?

2           MR. WASSERMAN:  1 and 3 of the indictment.  And

3    the government agreed to allocute at the low end of the

4    guideline range.

5           The defendant, under those terms, is free to

6    request that the Court vary downward, but the government's

7    allocution would be at the low end of the guideline, which

8    at this point is calculated at -- the range being 92 to 115

9    months.  So --

10           THE COURT:  So Count 1 is the gun charge.

11           MR. WASSERMAN:  That's correct.

12           THE COURT:  And Count 3 is the interference with

13    interstate commerce by robbery and aiding and abetting.

14           MR. WASSERMAN:  That is correct, Your Honor.

15           So part of the issue, quite frankly, here is the

16    robbery was done with at least two other individuals.

17    Obviously the government is interested in the defendant's

18    cooperation, and that limits my ability or my flexibility as

19    it relates to a plea offer.  So at this point this is --

20    this is what -- the best that I can do in terms of a plea

21    offer assuming, of course, the defendant chooses not to

22    cooperate.

23           You know, the confusion as it related to whether

24    he was a career offender and Ms. Antonelli's discussions

25    with the defendant meaning well, you know, look, the

1    government -- because my flexibility, had he been a career

2    offender, to advocate or agree to allocute to a sentence

3    below that, I wasn't clear that I'd be able to do that.

4              I'm not sure what the Court's -- some Courts do

5    not apply the career offender guideline anymore.

6              THE COURT:  But that's now academic.  He's not a

7    career offender.

8              MR. WASSERMAN:  Oh, yes, it's academic.  No,

9    that's correct.

10             THE COURT:  But some of the discussions you and

11   Ms. Antonelli had, and Ms. Antonelli may have had with --

12             MR. WASSERMAN:  And I say that only to advise the

13   Court and the defendant that I can understand why there was

14   confusion because, you know, myself and Ms. Antonelli were

15   not clear on where the defendant's guidelines were, and

16   there was some back-and-forth between she and I about if he

17   were to take a plea, you know, what would be -- what the

18   Court might do, what might be most beneficial to him

19   depending on what Your Honor does with the career offender

20   guideline.

21             All of that is water under the bridge, but that's

22   just to say that I can understand why there may have been

23   some confusion and frustration by the defendant as it

24   related to the plea discussions.

25             That being said, my understanding is the defendant

1    is not happy with the plea offer.  He's obviously asserting

2    that he thinks that he has potential legal avenues to pursue

3    as it relates to the charges.

4         That's not the government's position.  The

5    government's position is that the case against the defendant

6    is extremely strong.  And I'm happy to lay out for the

7    defendant any --

8         THE COURT:  Well, do you -- for example, were

9    there any videos?  Cameras?

10        MR. WASSERMAN:  Yes, there's videos.

11        THE COURT:  That's all been turned over?

12        MR. WASSERMAN:  Yes.  The defendant's DNA was

13   found at the scene of the ATM on a watch.  The video shows

14   the watch falling off of the defendant.  The defendant has

15   tattoos up to his wrists, which are visible on the video,

16   although he was wearing a mask.  There is evidence --

17   incriminating evidence on the defendant's cellular telephone

18   that links him to this particular incident, including

19   photographs of large amounts of cash and a text message that

20   references this incident.

21        So, you know, from the government's position --

22   and then with respect to the firearm, the defendant's

23   admitted that the gun was his.  So -- and there's a

24   photograph of that gun where you can see the serial number

25   on his -- the phone that we seized from him.

1              So, you know, the government's case is strong.

2    This is the best plea offer that I can make.

3              THE COURT:  It's the best plea offer you can make

4    unless he decides to cooperate and provides the names of the

5    other two people.  Is that what you're saying?

6              MR. WASSERMAN:  Yes.

7              THE COURT:  If he provided information about the

8    other two people, then you would go below those numbers?

9              MR. WASSERMAN:  I mean, we would be doing, you

10   know, what -- a cooperation plea agreement, you know, which

11   would require him to provide, you know, complete and

12   truthful information as it related to this offense and

13   anything else that we needed in prosecuting the other

14   individuals that participated in this.

15             I mean, as I explain to every defendant, I have

16   no -- I can't make any promises about what the sentence is

17   because -- or whether a substantial assistance

18   recommendation, that is a recommendation that the defendant

19   be sentenced below the guideline, I can't make that decision

20   until the cooperation is complete.  Your Honor is the one

21   that ultimately makes that decision.  But I also never limit

22   the amount of time that could come off of a sentence because

23   I don't know what the value of the cooperation is.

24             And I would tell this defendant in a debrief that

25   could go everywhere from what he's facing now to time served

1    depending on how valuable his information is.  So that's

2    what I tell all defendants that are considering cooperation

3    as far as what the possibilities are with no promises of

4    what ultimately will happen.

5              And, you know, I understand the defendant's

6    decision, if he chooses not to cooperate, but that leaves

7    me -- that leaves my hands tied as it relates to, you know,

8    how good of a plea I can offer.

9              THE COURT:  Ms. Antonelli, anything else you want

10   to say?

11             MS. ANTONELLI:  No, Your Honor.  There's nothing

12   to add, I don't think.

13             THE COURT:  Mr. Boon, anything else you want to

14   say?

15             THE DEFENDANT:  No, Your Honor.

16             THE COURT:  Okay.  Here's what I suggest.  I'm not

17   going to grant the motion now because I want Ms. Antonelli

18   to make her best efforts over the next few days to, through

19   the Department of Corrections and the Bureau of Prisons --

20   the Department of Corrections and the Marshals Service, to

21   see whether or not there are ways to get Mr. Boon moved to

22   the D.C. Jail or CTF or somewhere closer to the District of

23   Columbia.  And unless she can say to the people she talks to

24   "I am his lawyer," she's not going to get anywhere.

25             So she needs to remain as your lawyer to try to --

1    whatever steps can be taken to get you moved.  And if it's

2    useful, perhaps the two of you can talk in the cell block

3    before Mr. Boon leaves the building today.  And maybe -- is

4    the best way for you to advise me what's happening to file

5    something or to just send an email to me with a copy to the

6    government in terms of any progress you've made in getting

7    him moved and just to confirm that he still and you still

8    want to withdraw?

9              MS. ANTONELLI:  Whatever the Court prefers, but I

10   think an email is obviously easier, if the Court's okay with

11   that.

12             THE COURT:  I just don't know that you want to put

13   on the public record your conversations with what the

14   Marshal said or didn't say.

15             MS. ANTONELLI:  Correct.

16             THE COURT:  So as long as you keep Mr. Boon up to

17   date and then send an email to my chambers with a copy to

18   Mr. Wasserman --

19             MS. ANTONELLI:  And I should have said to the

20   Court earlier when I was standing up here, I was just in

21   front of Judge Collyer yesterday, and an attorney was

22   arguing about his client being far away, and she said in

23   open court yesterday that she had looked into it and talked

24   to people, and, unfortunately, there was nothing she could

25   do.  But I am still willing to call the Marshals and make

1   some calls.

2           THE COURT:  I think she may be right.  And, in

3   fact, I think -- because this has been the subject of some

4   email exchanges recently.  I think Judge Collyer has

5   actually written an opinion saying that place of

6   incarceration is generally not something a Court can order.

7           On the other hand, I think lawyers can

8   sometimes -- assuming there's space, and I think that the

9   Deputy Marshal Criego has been helpful in some cases, and I

10  know that Ms. Amato's been helpful in some cases, and I

11  think Mr. Boon has -- the fact that he's been -- he's had

12  three different lawyers and has found it difficult to

13  communicate, and he's facing -- Mr. Boon, I think you're

14  facing some hard decisions here based on what Mr. Wasserman

15  just said because he may be right, he may be wrong, but he

16  basically outlined for us just now what the government's

17  evidence would be at trial, and it sounds like it's a pretty

18  strong case against you.

19          He also outlined what the plea agreement proposal

20  is and the range of months that you'd likely serve.  That's

21  a long time, even with the plea.

22          And then the third option, I gather, is one you

23  haven't been interested in, which is if you cooperate with

24  the government, and if you identify the other individuals.

25  Assuming there are other individuals and you know who they

1    are and you cooperate, then the sentence could be a lot

2    less.

3              So those are your three choices, and none of which

4    are good ones.  One is to cooperate with the government and

5    tell them who else was involved.  The other one is to

6    go to trial, and you never know what's going to happen at

7    trial, what juries do and how they evaluate the evidence.

8    But it sounds like the government has not just witnesses

9    but video and DNA and text messages and things.  And then

10   there's the middle ground, which is a plea.  Whether

11   Ms. Antonelli or any other lawyer can get a better plea

12   offer out of Mr. Wasserman and his superiors, I don't know.

13             So why don't we leave it this way.  We'll -- I

14   won't grant the motion now.  Ms. Antonelli will make her

15   best efforts over the next several days to try to see if she

16   can get you moved closer, and I will be thinking about who

17   to appoint to represent you.  Ms. Antonelli will send an

18   email to me and Mr. Wasserman and keep you up to date to

19   advise us about whether any progress has been made on moving

20   you and whether you and she still want me to grant her

21   motion to withdraw.  But I don't want to do that until she's

22   used her best efforts while still your lawyer with the jail

23   authorities.

24             But I guess we should set another status even

25   though it may be with a different lawyer.  I'm not sure we

1    can do anything this month, but it's up to you.

2              MR. WASSERMAN:  Your Honor, I know I'm going to be

3    out the last two weeks of December so...

4              THE COURT:  Well, it may take a while to get a new

5    lawyer, which is what I have to do, and for that lawyer to

6    get Ms. Antonelli's file and get up to speed, so I guess we

7    should talk about after the first of the year.

8              MR. WASSERMAN:  Does the Court want to do the week

9    of the 7th?

10             THE COURT:  Pardon me?

11             MR. WASSERMAN:  The week of the 7th of January?

12             THE COURT:  That's fine.

13             Assuming you might or might not still be involved,

14    let's look at your calendar anyway.

15             MS. ANTONELLI:  I actually have a trial that

16    entire week until -- Friday the 11th, I could do it, or we

17    could go into the next week, the week of the 14th.

18             MR. WASSERMAN:  I'm available on the 11th.

19             THE COURT:  I can't do it the 11th.

20             Why don't we -- where is your trial?

21             MS. ANTONELLI:  Across the street in Superior

22    Court.

23             THE COURT:  What time do they usually start?

24             MS. ANTONELLI:  9:30.

25             THE COURT:  Do you want to set it for 9:00 a.m.?

1              You may not be on the case then.

2              MS. ANTONELLI:  Right.

3              THE COURT:  But if we set it at 9:00 a.m. would

4    that work?  But is that too problematical?

5              MS. ANTONELLI:  I think that may be difficult,

6    Your Honor, just to get across and through security in time

7    to be there by 9:30 without getting in trouble.

8              THE COURT:  Well, I'm going to set it for a day

9    that week anyway, and if you're still in the case, maybe

10   we'll move it.

11             MS. ANTONELLI:  Very well.  That's fine.

12             THE COURT:  So what day?  Do you care?

13             MR. WASSERMAN:  I'm available -- I have a 10:00,

14   a sentencing with Judge Moss at 10:00, so I'm available.

15             THE COURT:  What date?

16             MR. WASSERMAN:  That's the 7th of January.

17             THE COURT:  Oh.

18             MR. WASSERMAN:  But I'm available any other day

19   that week or later in the day on the 7th.

20             THE COURT:  Want to say 9:30 on the 9th?

21             MR. WASSERMAN:  That's fine, Your Honor.

22             THE COURT:  January 9th at 9:30 for a status

23   conference, and I'll -- if Ms. Antonelli's still in the

24   case, and her trial, if it actually goes forward, we'll

25   change the date to the following week.

1          MS. ANTONELLI:  Thank you, Your Honor.

2          MR. WASSERMAN:  Very well.

3          THE COURT:  And I've tolled -- the pending motion

4     will toll the running of the speedy trial for a portion of

5     that time, and I'm going to toll the running of the speedy

6     trial in the interest of justice until the 9th of January

7     under the theory that while the motion may not still be

8     pending after this week, the relief that I would provide if

9     I granted that motion is appointing a new lawyer, who, in

10    Mr. Boon's best interest, will need the time to get up to

11    speed on the case.  So I think it's in the interest of

12    justice to toll the running of the speedy trial until the

13    status conference on January 9th.

14          MR. WASSERMAN:  Very well, Your Honor.

15          MS. ANTONELLI:  Thank you, Your Honor.

16          THE COURT:  Okay.  Anything else?

17          MR. WASSERMAN:  Nothing from the government.

18          THE COURT:  All right.  And Ms. Antonelli will

19    talk to you in the cell block now and will advise you of the

20    progress she made maybe later this week on the possibility

21    of trying to get you moved.

22          And you can email or call me if you want me to

23    talk to the deputy marshal, but I think -- he has been very

24    helpful in other cases to the extent he can be, so I think

25    you'll find him cooperative even -- and will do what he can.

1    I'm not promising he can produce results, but if you need me

2    to intervene with talking to anybody, please let me know.

3              MS. ANTONELLI:  Thank you, Your Honor.

4                   (Whereupon the hearing was

5                   concluded at 11:19 a.m.)

6

7         **CERTIFICATE OF OFFICIAL COURT REPORTER**

8

9              I, LISA A. MOREIRA, RDR, CRR, do hereby

10   certify that the above and foregoing constitutes a true and

11   accurate transcript of my stenographic notes and is a full,

12   true and complete transcript of the proceedings to the best

13   of my ability.

14        Dated this 21st day of September, 2022.

15

16

17                        /s/Lisa A. Moreira, RDR, CRR
                          Official Court Reporter
18                        United States Courthouse
                          Room 6718
19                        333 Constitution Avenue, NW
                          Washington, DC 20001

20

21

22

23

24

25