```
                   BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        .
                                 .  Case Number 18-cr-78
         Plaintiff,              .
                                 .
    vs.                          .
                                 .  Washington, D.C.
ARNOLD S. BOON,                  .  May 17, 2018
                                 .  10:12 a.m.
         Defendant.              .
- - - - - - - - - - - - - - - - -


            TRANSCRIPT OF ARRAIGNMENT AND STATUS CONFERENCE
                 BEFORE THE HONORABLE PAUL L. FRIEDMAN
                     UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the United States:        STEVEN WASSERMAN, AUSA
                              United States Attorney's Office
                              601 D Street Northwest
                              Washington, D.C. 20579


For the Defendant:            CARLOS VANEGAS, AFPD
                              Federal Public Defender's Office
                              625 Indiana Avenue Northwest
                              Suite 550
                              Washington, D.C. 20004


Official Court Reporter:      SARA A. WICK, RPR, CRR
                              United States District Court
                                for the District of Columbia
                              333 Constitution Avenue Northwest
                              Room 4704-B
                              Washington, D.C. 20001
                              202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S
 2          (Call to order of the court.)
 3              THE COURTROOM DEPUTY:  Your Honor, this is Criminal
 4    Case Number 18-078, the United States of America versus
 5    Arnold S. Boon.  The defendant is present.
 6        Will counsel please approach the podium and identify
 7    yourselves for the record.
 8              MR. WASSERMAN:  Good morning, your Honor.  Steven
 9    Wasserman on behalf of the United States.
10              MR. VANEGAS:  Good morning, your Honor.  Carlos
11    Vanegas on behalf of Mr. Armond Boon.
12              THE COURT:  So where are we?  We have a superseding
13    indictment; right?
14              MR. VANEGAS:  Yes, your Honor.
15              THE COURT:  So we need to arraign Mr. Boon first.
16        Mr. Boon, why don't you come up to the podium.  Good
17    morning, Mr. Boon.
18              THE DEFENDANT:  Good morning, your Honor.
19              THE COURTROOM DEPUTY:  Your Honor, may the record
20    reflect that the defendant has received a copy of the
21    superseding indictment.
22        Do you waive the formal reading of this indictment?
23              MR. VANEGAS:  Your Honor, on behalf of Mr. Boon, we do
24    waive formal reading of the indictment.
25              THE COURTROOM DEPUTY:  How do you wish to plead?
```

1            MR. VANEGAS:  Your Honor, on behalf of Mr. Boon, he
2    enters a plea of not guilty to each count charged in the
3    superseding indictment and asserts all his constitutional
4    rights.
5            THE COURT:  Thank you, Mr. Boon.  You've been
6    arraigned on this superseding indictment.  Count 1 is unlawful
7    possession of a firearm and ammunition by a person previously
8    convicted of a felony under 922(g) of Title 18.  Count 2 is
9    conspiracy to interfere with interstate commerce by robbery.
10   And Count 3 is interference with interstate commerce by robbery
11   and aiding and abetting.  And then Count 4 is bank robbery and
12   aiding and abetting.  And then there's a forfeiture allegation
13   concerning, I guess, the pistol and ammunition.
14       So that's where we are.  Mr. Boon, you can have a seat.
15       So what's happened since the last time we were here,
16   Mr. Vanegas?
17           MR. VANEGAS:  Yes, your Honor.  What's been
18   time-consuming, your Honor, is trying to essentially get the
19   assistance on a DNA expert or to get access to DNA resources.
20       Mr. Boon initially was charged with burglary in Superior
21   Court of the District of Columbia, and at that time he was
22   assigned to a Public Defender Service attorney.  Her name is
23   Amanda Boone.  And for a while, there was a brief period of time
24   in which Mr. Boon was charged both with what is the burglary of
25   the 7-Eleven and the taking of this ATM, and separately, he was

1  charged here in federal court with a 922(g) for -- the
2  authorities found a firearm in his place of residence, in a
3  bedroom.  The reason they got to Mr. Boon is based on a DNA
4  sample of his blood that was found on a watch in the 7-Eleven
5  that depicts four individuals essentially backing up a pickup
6  truck into a 7-Eleven, door, glass is broken, and then you see
7  individuals basically picking up the ATM and putting it in the
8  back of this pickup truck.  And the law enforcement found a
9  watch, and on the watch, there is some blood.
10          As a result, they tested the DNA and put it through the
11 CODIS system.  And Mr. Wasserman can correct me if there's some
12 detail that I am missing here.  And essentially, that's how they
13 then got the warrant to search Mr. Boon's residence, and they
14 found the firearm.  Then he was charged with 922(g).
15          The burglary of the ATM, that was brought over here in
16 federal court, and that's why we have this superseding
17 indictment.  Other than essentially the -- that initial sample
18 of the DNA, that is, the blood on the watch, the basis for these
19 charges, Hobb's Act conspiracy and Hobb's Act substantive and
20 the bank robbery, it all comes down to that DNA sample.
21              THE COURT:  The DNA was taken from where?
22              MR. VANEGAS:  When the incident took place at the
23 7-Eleven --
24              THE COURT:  So is the argument that the DNA -- so
25 there was DNA at the ATM?  There was no identification of him?

1           MR. VANEGAS:  That's right.  There is just one of the
2   persons involved in the incident, it seems like he drops a
3   watch.
4           THE COURT:  Oh, I see.
5           MR. VANEGAS:  And then on the watch, there's blood,
6   and they test that blood for DNA and put it in their CODIS
7   system, and then there's a hit for Mr. Boon.
8       And so thereafter, there's no additional evidence, that is,
9   that ties Mr. Boon to this entry and destruction of property of
10  the 7-Eleven in which you see these individuals.  It's all
11  caught on video where they pick up the ATM and put it on the
12  back of the pickup truck and basically leave.
13          THE COURT:  And there's no video of Mr. Boon?
14          MR. VANEGAS:  There's no video -- there's no
15  identification of Mr. Boon, no.  You see four individuals, but
16  no one has come forward, there's no eyewitness that says that
17  one of the persons is Mr. Boon.
18          THE COURT:  And where -- so these events involving the
19  ATM occurred on January 19, 2018?
20          MR. VANEGAS:  Yes, your Honor.
21          THE COURT:  The 7-Eleven occurred when?  Is that the
22  March 17th date, or is that something unrelated?  It's not in
23  this indictment at all?
24          MR. VANEGAS:  Yes, your Honor.  January 19 is when
25  four individuals, they rammed --

1           THE COURT:  Oh, I see.  The January 19th is both the
2   7-Eleven and the ATM.
3           MR. VANEGAS:  Yes, your Honor.  Inside --
4           THE COURT:  Where is the gun then seized?  From him or
5   his residence or someplace later?
6           MR. VANEGAS:  Yes, March 17th, so essentially almost
7   two months later.
8        So because the first line of -- and foremost line of
9   defense is looking at this DNA evidence, because I'm sure that
10  the way that he has been indicted now in this federal indictment
11  is because it would be based on that DNA.  There's nothing else
12  that ties Mr. Boon, or there's no evidence otherwise.
13          THE COURT:  So is the DNA -- so you are looking for a
14  DNA expert?
15          MR. VANEGAS:  Yes.  And I think I have found it, your
16  Honor, and I have found it through the assistance of the Public
17  Defender Service by way of the fact that the lawyer that
18  Mr. Boon had in Superior Court is a PDS lawyer.  I then
19  endeavored to enlist her help in co-counseling this case because
20  she actually had investigated the burglary.  But I went further
21  up the chain of command and spoke to Mr. Rudy Acree, who is the
22  deputy director.
23       And at PDS, they have a forensic practice unit, and within
24  that unit, they also have a scientist who basically looks at the
25  DNA evidence.  And so I finally have been able to get an

1  agreement or approval from Mr. Acree that Ms. Amanda Rogers can
2  help me with this and that I will then have access to their DNA.
3           And so that's what's taking a long time.  To me --
4  otherwise, I would not be able to do this case, your Honor.  I
5  would need --
6              THE COURT:  That's fine.  In your view, is the DNA --
7  assuming that you get something useful, does that -- is that to
8  help with the defense at trial, or is it also possibly in
9  addition to support a motion to suppress the gun?
10             MR. VANEGAS:  Both, your Honor; it would be both.
11 Because we need to look at the results of that conclusions of
12 CODIS, when they submitted that initial sample.  So it would be
13 both.  It would also be for the purpose of looking for discovery
14 purposes, that is, the type of testing.
15          And what they have at PDS is pretty sophisticated because
16 they deal with homicides and sexual assaults.  They're always
17 dealing with that.  And we're only starting to see this.
18          So as a result, from the get-go, I knew that this was going
19 to be a huge challenge for me, and I didn't want to be in a
20 position where I was going to learn on behalf of Mr. Boon.  It
21 would just be totally wrong, ineffective.
22          So I believe that based on the conversation I had with
23 Mr. Acree yesterday that I will have the services of Ms. Rogers,
24 and that will allow me to have the services of their forensic --
25 or support of their forensic unit, trial practice unit and the

1  scientist. That was all discussed.

2  I also informed Mr. Boon about this and that I have been
3  trying to do this. And it's clearly the foremost and first line
4  of his defense, because there's nothing else, as far as I can
5  tell from what the government --

6  THE COURT: It sounds like -- Mr. Wasserman may
7  disagree with you, but it sounds like it's the heart of their
8  case, as well as the heart of your defense, but he may have
9  more.

10  MR. VANEGAS: Yeah, that may be so, your Honor. So
11  that's where we're at.

12  In the meantime, we have discussed -- prior to the
13  superseding indictment, there was a question of when these
14  charges were going to be brought. Before that, we were looking
15  at what his base offense level was just for the gun, what could
16  he possibly do if there was a superseding indictment that
17  charged two distinct crimes. So all that has been discussed.

18  But now this challenge with the DNA evidence and the
19  superseding indictment, it's much broader, and at least I have
20  the beginnings of trying to put this in perspective and create,
21  generate a defense on his behalf. So that's what's been going
22  on.

23  Additionally, the government does have quite a few body
24  cameras from the police officer who investigated the 7-Eleven,
25  that is, and also the taking of the ATM machine. So I have

1   given them a hard drive.  They will provide that to me.  I will
2   show that to Mr. Boon, and we will start making substantial
3   progress on this case.
4        That's where we are at, your Honor.
5            THE COURT:  So one other unrelated question to you.
6   Last time we were here, my notes show that you indicated you
7   might be filing a bond review motion, and I didn't see anything
8   in the file on that.
9            MR. VANEGAS:  That's correct, your Honor.  And part of
10  it was because I wasn't sure what was going to be -- whether the
11  government was going to file these additional charges.  And so
12  now it's -- I believe when it was just 922(g), a firearm in the
13  residence with no fingerprint -- the government does have a
14  videotape statement where there's admission of ownership, but
15  that's going to be the basis for a suppression motion.  But this
16  adds more to, you know --
17           THE COURT:  So we may have a motion to suppress
18  statement, and we may have a motion to suppress the gun itself.
19  The latter depends on what you learn with the help of your DNA
20  expert.
21           MR. VANEGAS:  Yes, your Honor.
22           THE COURT:  Okay.  Mr. Wasserman?
23           MR. WASSERMAN:  Good morning again, your Honor.
24       I had sent an e-mail or a letter to Mr. Vanegas back on
25  April 21st indicating that we had items that we were planning on

1  sending out for DNA testing and inquiring whether the defendant
2  would have any objection to the consumption of the DNA evidence
3  as a result of that testing.  I know both Mr. Vanegas and I were
4  out of jurisdiction at about the same time for about a week.
5  Mr. Vanegas has informed me this morning that they will be
6  objecting to the consumption of the DNA.  So that's going to
7  require the filing of motions.
8              THE COURT:  So when you do a DNA test, that's what
9  you're talking about in terms of consumption of the DNA.  Does
10 that mean that there's nothing left on the object that his
11 separate and independent expert could examine?
12             MR. WASSERMAN:  Correct; right.  The evidence is
13 swabbed.  So they don't even know if there is DNA evidence,
14 obviously, until they test those.  And in those situations, if
15 there is DNA evidence, it's usually not much.  So the reality of
16 it is, if you try to split -- and this is my understanding.  I'm
17 not a DNA expert either, by any stretch.  I have some
18 familiarity but probably not much more than Mr. Vanegas.  But
19 when you split those swabs, what can end up happening is you can
20 essentially destroy any ability to get a usable sample, which is
21 typically why the government objects to -- or, you know,
22 indicates that the DNA testing, in order to be useful, will
23 likely consume the DNA that's present on any of the swabs.
24             THE COURT:  I assume, again, that just as the person
25 he will be talking to at PDS has a lot of experience with

1    homicides and sexual assaults, that you have colleagues in
2    Superior Court who do as well.  And my guess is that they --
3    they may have devised methodologies to work together on
4    examining material or --
5             MR. WASSERMAN:  You know, I've -- my understanding is
6    on occasions -- typically, I think the law is -- generally
7    allows for the consumption.  I believe what has been done in the
8    past is we will arrange to have the defense DNA expert observe
9    the testing so that they can have some oversight and ability to,
10   you know, raise any concerns with that testing process.  I don't
11   know whether that's -- that was what was done, if I recall, when
12   I was prosecuting homicides some years ago.
13        So that may be an option, but I have to check, because I
14   don't know what the practice is right now.
15             THE COURT:  Okay.  So essentially, what the defense
16   DNA expert would be doing would both be -- might raise issues
17   with respect to the process, but neither side -- you don't know
18   whether it's going to be helpful to your case and he doesn't
19   know whether it's going to be helpful to his case until the
20   tests are actually done by somebody.
21             MR. WASSERMAN:  Correct; correct.  I'm fairly
22   confident that the blood evidence -- we will be testing other
23   evidence that was recovered from the scene in addition to
24   confirming the CODIS hit from the blood that was recovered from
25   the watch.  I'm relatively confident that that will be

1    confirmed.

2         We will also swab the firearm and print the firearm that
3    was recovered from Mr. Boon's residence.  That may or may not
4    produce anything useable, but yes, I don't know.

5              THE COURT:  I don't have a copy of the affidavit in
6    support of -- it was a search warrant, I assume?

7              MR. WASSERMAN:  Correct.

8              THE COURT:  I don't have that in my file, but I assume
9    Mr. Vanegas has it?

10             MR. WASSERMAN:  I've turned that over, yes.

11             THE COURT:  And is it your recollection that the --
12   what supported probable cause was the DNA, or was there more?

13             MR. WASSERMAN:  It was primarily the DNA, the CODIS
14   hit.

15             THE COURT:  So we've got some sort of preliminary
16   determination, even though --

17             MR. WASSERMAN:  Exactly, yeah.

18             THE COURT:  Having looked at the video from the
19   cameras and the people taking the ATM machine, do you have now
20   or do you expect you will have with further analysis of those
21   videos identification of Mr. Boon?

22             MR. WASSERMAN:  I do, your Honor.  The individual that
23   was wearing the watch meets the general description that's
24   consistent with Mr. Boon.  Mr. Boon also has tattoos on both
25   wrists.  Those are -- you can see tattoos in the video at one

1 point. You can't necessarily make out the type of tattoo, but
2 it's consistent with Mr. Boon having tattoos on his wrist. So
3 there is some corroboration from the video itself, both in the
4 appearance -- they were all wearing masks. So it's not like his
5 face is exposed. But there is some corroboration there.
6     I do expect that there will be -- we're in the process of
7 executing search warrants on two cellular telephones that were
8 recovered from Mr. Boon's residence. That may or may not --
9         THE COURT: Prove anything. And what about the
10 7-Eleven? Are there any videos at the 7-Eleven?
11         MR. WASSERMAN: The videos that I was referring to are
12 from the 7-Eleven.
13         THE COURT: Is the ATM at the 7-Eleven?
14         MR. WASSERMAN: Correct.
15         THE COURT: Maybe that's what I'm confused about. I
16 had in my mind two separate things going on.
17         MR. WASSERMAN: So the truck was smashed through the
18 front of the 7-Eleven, and the ATM was lifted by three
19 individuals onto the bed of the truck.
20     And I will be making this information, the search warrant
21 for the cell phones, obviously, available to Mr. Vanegas. And
22 once we get those results from the search warrant of the cell
23 phones themselves, obviously, I will produce that as well.
24     So for our purposes, I think typically what happens is we
25 send this letter asking for consent to consume the DNA. If the

1  defense objects, usually, it's done via a motion so that I am
2  aware of what the legal basis or what their legal arguments are
3  for objecting to that, and then I would file a response.
4              THE COURT:  Or from what you've said, in some cases,
5  there may not be an objection but a "can we come and observe and
6  we will be satisfied with that"?
7              MR. WASSERMAN:  And I can look into that, what the
8  practice is and if that's acceptable to Mr. Vanegas.
9              THE COURT:  It seems to me -- you probably have more
10 experience having been in homicide than I do certainly and maybe
11 than Mr. Vanegas has had.  But when he begins to work with the
12 lawyer from PDS and the expert from PDS and you talk to your
13 people currently in homicide, you may have a meeting of the
14 minds on how to proceed.
15             MR. WASSERMAN:  Sure.
16             THE COURT:  Okay.  It sounds like we're going to need
17 time for all of this.
18             MR. WASSERMAN:  Yes.
19             THE COURT:  And it sounds like, depending on the
20 results of the DNA, we may have -- you have to prove your case
21 beyond a reasonable doubt.  So it may or may not help you.  We
22 may have some motions pre-DNA testing and post-DNA testing.
23          So what do you suggest we do with respect to time,
24 Mr. Vanegas?  Obviously, your client has a right to a speedy
25 trial, and at the moment, there are no current motions pending.

1           MR. WASSERMAN:  Correct.

2           MR. VANEGAS:  Yes, your Honor.  I did speak to
3    Mr. Boon regarding the complexity of the trial and how this area
4    is fundamental to his defense.  Knowing that, getting someone on
5    board with some expertise, he is willing to exclude time under
6    the Speedy Trial Act.

7           We talked about 30 days, and during those 30 days, I will
8    get the body-worn videos to Mr. Boon.  I'm sure that
9    Mr. Wasserman will get them to me soon.  I will be meeting with
10   the PDS lawyer and also discuss the consumption issue, because
11   they may have a different view as to whether the expert can be
12   available for the testing or whether, based on the current law,
13   whether it's something that we're not going to be able to
14   prevail.  Because typically, the rulings are adverse towards the
15   defense.  Now and then, we strike some gold here and there, but
16   by and large, judges are of the opinion -- well, they deny these
17   requests -- the objections.  They side with the government on
18   the consumption issue.

19          But that's something that I will look into it.  If I file a
20   motion, it will be within 10 days.  If I speak to the expert and
21   there's no basis to file a motion or they think that they can
22   work based on being present for the testing, then I will inform
23   the Court through a status report letting Your Honor know where
24   we are with that issue.  Otherwise, then within that time frame,
25   we can also file Mr. Boon's motion to modify bond.

```
1         So I think 30 days or 45 days would be satisfactory.  It
2    will be fine, your Honor, to work within that time frame.
3              THE COURT:  30 days is -- the week of the 18th, I
4    begin a bench trial.  We want to start at 9:30 every morning.
5    So I could either see you all at 9:00 a.m. or at lunchtime one
6    of those days, the week of the 18th or the week of the 25th.
7              MR. VANEGAS:  Your Honor, can we go to the week of the
8    25th?
9              THE COURT:  Sure.  So we could either do -- we could
10   do it 9:00 a.m. any of those mornings or at lunchtime.  The
11   trial could be over.  It's not clear to me how long it's
12   actually going to go.  It could be over by the 27th or the 28th,
13   if you wanted to --
14             MR. WASSERMAN:  The 27th, your Honor.
15             THE COURT:  Is 9:00 a.m. okay with you all?
16             MR. WASSERMAN:  9:00 a.m. is okay.  9:30 is better.
17             THE COURT:  It's better for me, too.
18             MR. VANEGAS:  9:30 is fine, your Honor.
19             THE COURT:  9:30 on the 27th?
20             MR. VANEGAS:  Yes.
21             THE COURT:  All right. And if I'm still in trial --
22   it could be over by then, but if I'm still in trial, I will just
23   tell them we will start at 9:45 or 10:00.
24        In the meantime, I won't set any deadlines, Mr. Vanegas,
25   but if you file a bond review motion, we could have a hearing on
```

1    that before June 27th, if you give the government time to file
2    something.  If you call my deputy, we can find a day.  And if
3    you have anything else -- you indicated that you might file a
4    status report in the meantime; right?
5              MR. VANEGAS:  Yes, your Honor.
6              THE COURT:  All right.  But I think if you all
7    continue to work cooperatively with each other on some of these
8    procedural things, we will be all right.  It's either going to
9    be -- if their DNA comes up strong or if they have a more
10   positive identification, it may be that a plea would make sense.
11   And otherwise, if there's -- it may be a very triable case.
12             MR. VANEGAS:  Yes, your Honor.
13             THE COURT:  Oh, thank you.  That's why I have experts.
14        Mr. Boon, could you stand up for a minute, please.  You
15   heard the discussion we just had and the amount of time it's
16   going to take to focus on this DNA evidence and get the experts
17   involved with Mr. Vanegas.  Are you prepared to give up your
18   right to speedy trial between now and June 27th when we get back
19   together here again?
20             THE DEFENDANT:  Yes, your Honor.
21             THE COURT:  Okay.  Thank you very much.  I find that
22   it's in the interest of justice and to allow the defense to do a
23   thorough investigation and engage an expert assistance to toll
24   the running of the speedy trial between now and June 27th, and
25   so I will do so.

```
 1         Thank you.
 2         (Proceedings adjourned at 10:38 a.m.)
 3
 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 5
 6                 CERTIFICATE OF OFFICIAL COURT REPORTER
 7
 8         I, Sara A. Wick, certify that the foregoing is a
 9    correct transcript from the record of proceedings in the
10    above-entitled matter.
11
12
13    /s/ Sara A. Wick                    September 26, 2022
14    SIGNATURE OF COURT REPORTER         DATE
```